UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \*

| | |
|---|---|
| LAURA CONKLIN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF RENO, a municipal corporation, ) <br> PETER RINALDO, an individual, and ) <br> ROBERT MCDONALD, an individual ) <br> ) <br> Defendants. ) <br> ) <br> ) | 3:08-cv-00452-LRH-RAM <br><br> ORDER |

Before the court is Defendants City of Reno and Peter Rinaldo's (collectively "Defendants") Motion for Summary Judgment (#49[1]).[2] Plaintiff Laura Conklin has filed an opposition (#52) to which Defendants replied (#56).

**I.   Facts and Procedural History**

This is an employment discrimination dispute arising out of Plaintiff's work as a police officer with the Reno Police Department ("RPD").  Plaintiff began working for the RPD on

---

[1] Refers to the court's docket entry number.

[2] Plaintiff's claims against Defendant Robert McDonald have been dismissed.  (*See* Order (#46).)

May 4, 1998. Immediately after graduating from the police academy, Plaintiff entered the RPD's field training program. During the program, Plaintiff spent three or four weeks training under three different officers.

The third officer under whom Plaintiff trained was Defendant Rinaldo. Plaintiff worked a total of nine, ten hour shifts with Rinaldo. Plaintiff testified that her personality did not mix well with Rinaldo's personality. Plaintiff noted in particular that Rinaldo was argumentative, that he constantly berated her, and that he would tell her she was "dumb." (Defs.' Mot. Summ. J. (#49), Ex. 1 at 15:3-7.) Plaintiff further testified to the following: (1) Rinaldo called her "probie"; (2) while working, Plaintiff and Rinaldo would go to Rinaldo's friend's house and Rinaldo told Plaintiff not to let other officers know their location; (3) Rinaldo once wrote in Plaintiff's daily operations report that Plaintiff had mistakenly reported their location; (4) when Rinaldo and Plaintiff responded to a robbery and Plaintiff forgot to provide certain paperwork, Rinaldo stated, "[I]f I have to remind you one more time what fucking paperwork to use, I'm going to fire you"; (5) Rinaldo asked Plaintiff if another female officer wore thong underwear, asked Plaintiff to take a picture of the female officer while she changed, and told Plaintiff he would pass her in the training program if she would get the officer to skinny dip with him; (6) Rinaldo asked Plaintiff if she had any friends who wanted to "fuck him," and after seeing a friend of Plaintiff's while on patrol, Rinaldo asked her to see if her friend wanted to "fuck him"; (7) during a conversation in which Plaintiff and Rinaldo were discussing the Howard Stern show Rinaldo stated he would "get the most strokes in per minute if he had the chance to fuck a porn star"; (8) Rinaldo told Plaintiff that when she arrested or came in contact with a suspect, she needed to say, "fuck you, you fucking fuck bag"; (9) Rinaldo told Plaintiff he did not want to arrest or transport anyone because it would get the patrol car dirty and required Plaintiff to wash the patrol car every morning; (10) after Rinaldo attempted to speak with his child on the phone and the child's mother would not let him, Rinaldo

1  hung up the phone and called the mother a "cunt"; (11) after eating dinner together at a restaurant,
2  Plaintiff asked if they could stop and use the restroom at the station, and Rinaldo told Plaintiff she
3  had to use the restroom at the restaurant; (12) Rinaldo told Plaintiff that if he did not get time to
4  drink a latte each night, he would fire Plaintiff; (13) when Plaintiff responded to her first armed
5  robbery call, Rinaldo did nothing to assist her, and when she finished he stated, "I let you handle
6  one call and you fucked the whole thing up"; and (14) in response to Plaintiff asking Rinaldo about
7  how to fill out her reports, Rinaldo stated, "[Y]ou will do it my way because I fucking told you to."
8       After nine shifts with Rinaldo, Plaintiff spoke to Officer Morton, her first training officer.
9  Officer Morton asked Plaintiff how the training was going, and Plaintiff responded that the training
10 was not going well.  In particular, Plaintiff told Officer Morton about the armed robbery call,
11 Rinaldo's response to her failure to provide the proper paperwork during their response to another
12 robbery call, Rinaldo's remarks concerning skinny dipping with another female officer, and the
13 bathroom incident.
14      Officer Morton told Dave Ponte, the training coordinator, about Plaintiff's comments.
15 Ponte immediately ended Plaintiff's training with Rinaldo.  In response, Plaintiff asked if she could
16 finish her training time with Rinaldo.  Ponte did not grant Plaintiff's request and instead placed
17 Plaintiff with another training officer to complete her training.
18      Plaintiff successfully finished her training, and after completing her one year probationary
19 period, she served in a variety of capacities for the RPD.  After her initial training, Plaintiff had
20 very little contact with Rinaldo.  However, in 2000, Rinaldo and Plaintiff were in a training
21 exercise where Plaintiff acted as a hostage.  Rinaldo held a paint pellet gun to Plaintiff's head,
22 pushed his groin against her back, and whispered in her ear, "How does it feel to have me holding a
23 gun to your head?"  (Defs.' Mot. Summ. J. (#49), Ex 1 at 39:7-12; Pl.'s Opp. (#52), Ex. 1 at 39:10-
24 12.)
25

3

While Plaintiff testified that Rinaldo never referred to her directly in derogatory terms, other officers told Plaintiff approximately six times that they overheard Rinaldo in the locker room calling Plaintiff a "cunt" or "dike." (Defs.' Mot. Summ. J. (#49), Ex 1 at 97:4-12.) Plaintiff's response to these statements was, "I [didn't] need to hear it. I mean, I've heard it, and whatever." (*Id.* at 97:14-15.)

On November 16, 2007, Plaintiff attended a training exercise. While waiting to participate in the exercise, Plaintiff and another officer, Modesto Reyes, began telling "war stor[ies]" about various officers in the department. After Rinaldo's name came up, Plaintiff told Officer Reyes about her training experience with Rinaldo. Will Yawn overheard Plaintiff's statements and spoke up to defend Rinaldo, stating that he would never do the things Plaintiff said.

The following day, Officer Yawn spoke to Rinaldo about Plaintiff's comments. Rinaldo then spoke with Officer Reyes, who confirmed that Plaintiff had made the comments. Because Rinaldo had heard about Plaintiff making similar comments in the past, he decided to file a complaint against Plaintiff with Internal Affairs.

On November 20, 2007, Lieutenant McDonald called Plaintiff into Commander Holladay's office to discuss Plaintiff's statements during the November 16, 2007, training. At the meeting, Lieutenant McDonald told Plaintiff that an investigation into the incident and other incidents where Plaintiff allegedly made disparaging remarks about Rinaldo was being conducted. Lieutenant McDonald also read and gave to Plaintiff a supervisory performance directive instructing Plaintiff to comply with the following while on duty: (1) not to make disparaging, threatening, or harassing remarks about or to Officer Rinaldo except to advise a supervisor regarding potential ongoing behavior; (2) not to contact Officer Rinaldo unless required for specific job-related activities; and (3) if Plaintiff did have contact with Officer Rinaldo while on duty, to conduct herself in a professional manner and immediately report any such contact to her supervisor. Lieutenant

4

1  McDonald asked Plaintiff if she wanted a copy of the directive, and she said that she did not.

2  On December 20, 2007, Plaintiff was scheduled for a training, and she learned that Rinaldo was to be in the training the following day.  Plaintiff could not remember whether the directive would prohibit her from participating in the training.  She attempted to contact her supervisor and Lieutenant McDonald to receive a copy of the directive, but neither her supervisor nor Lieutenant McDonald returned her calls. As a result, Plaintiff did not participate in the training.

On April 11, 2008, Plaintiff filed a discrimination and harassment complaint alleging that, since 1998, Rinaldo had discriminated against her.  In particular, Plaintiff noted the instances cited above concerning her training with Rinaldo in 1998 and the incident that took place during the 2000 training.  Plaintiff further alleged that Rinaldo filed the Internal Affairs complaint "maliciously" because she had told other officers about his actions.  Finally, Plaintiff alleged that the RPD had failed to correct the actions taken by Rinaldo, which had created a hostile and discriminatory work environment for herself and for future trainees.

On May 6, 2008, Plaintiff asked Lieutenant McDonald to lift the November, 2007, performance directive.  McDonald responded that the directive would remain in effective until the Disciplinary Review Board and Chief of Police had completed their investigation.

On June 18, 2008, Plaintiff was informed that the Disciplinary Review Board had concluded that Rinaldo's allegations could not be sustained and recommended that no disciplinary action be taken against Plaintiff.  The Review Boards' report was submitted to the Police Department Discipline Board on May 28, 2008.  The Board likewise recommended that no action be taken against Plaintiff.  On June 2, 2008, the Chief of Police completed his review of the decision and agreed with the Board's recommendation.  Plaintiff was informed immediately, and on July 9, 2008, the performance directive was lifted.

///

## II.     Legal Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact.  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *Id.* at 252.

### III. Discussion

Plaintiff asserts the following claims for relief: (1) violations of her rights under the First Amendment pursuant to 42 U.S.C. § 1983; (2) denial of equal protection in the form of retaliation and discrimination on the basis of her gender and sexual orientation in violation the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; and (3) negligence. Defendants seek summary judgment with regard to each of these claims.

#### A. First Amendment Retaliation

Plaintiff first alleges Defendants retaliated against her for exercising her First Amendment right to free speech. "It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006) (*quoting Connick v. Meyers*, 461 U.S. 138, 142 (1983)). Generally, "[t]o sustain a First Amendment retaliation claim, a public employee must show (1) the employee engaged in constitutionally protected speech, (2) the employer took adverse employment action against the employee, and (3) the employee's speech was a 'substantial or motivating' factor in the adverse action." *Posey v. Lake Pend Oreille School District No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (*quoting Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006)).

Noting that "First Amendment retaliation law has evolved dramatically, if somewhat inconsistently," the Ninth Circuit recently clarified and explained the appropriate approach to assessing a First Amendment retaliation claim. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). In doing so, the court outlined the following sequential, five-step series of questions to be answered in a First Amendment retaliation case: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in an adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from

other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. *Id.* Because the court finds the first question determinative, the court will limit its discussion to that question.

Determining whether the speech at issue touched on a matter of public concern is purely a question of law properly decided on summary judgment. *Posey*, 546 F.3d at 1126 (citations omitted). The plaintiff "bear[s] the burden of showing that [her] speech addressed an issue of public concern based on the content, form, and context of a given statement, as revealed by the whole record." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (citations and internal quotation marks omitted).

The "greatest single factor" in determining whether speech addressed a matter of public concern is the content of the speech. *Id.* (citation omitted). "If employee expression relates to an issue of 'political, social, or other concern to the community,' it may fairly be said to be of public concern." *Brewster v. Lynwood Unified Sch. Dist.*, 149 F.3d 971, 978 (9th Cir. 1998) (*quoting Connick*, 461 U.S. at 146). In particular, speech addresses a matter of public concern where it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Desrochers*, 572 F.3d at 710 (citation omitted). "On the other hand, speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies is generally not of 'public concern.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citation omitted).

In addition, the form and context of Plaintiff's speech are also relevant to the court's assessment of whether the First Amendment protects the speech. *See Ulrich v. City & County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002) (citation omitted). In the analysis of form and context, the court focuses on the purpose of the speech, and considers such factors as the

employee's motivation and the audience chosen for the speech. *Id.* (citation omitted).

Plaintiff contends that she engaged in protected speech when she (1) discussed in November of 2007 her experience training with Rinaldo with Officer Reyes, (2) submitted a complaint on April 11, 2008, concerning Rinaldo's conduct, and (3) complained to her supervisor in 1998 about Rinaldo's conduct during her training.

The court has reviewed the content, context, and form of this speech and finds that the speech does not address matters of public concern. First, both Plaintiff's November, 2007, statements and the statements made in her April, 2008, complaint described Rinaldo's inappropriate behavior during her training in 1998. While reporting such inappropriate behavior could, in certain circumstances, be considered a matter of public concern, the form and context of the statements demonstrate that the statements were intended to highlight a workplace grievance rather than to provide information relevant to the public's evaluation of the police department.

For example, Plaintiff made the November, 2007, statements to a handful of fellow officers while the officers were relating "war stories" about their experiences in the police department. Although not dispositive, "[a] limited audience weighs against a claim of protected speech . . . [because] [p]ublic speech is more likely to serve the public values of the First Amendment." *Desrochers*, 572 F.3d at 714 (citations omitted). Further, Plaintiff's statements concerned conduct that occurred approximately nine years earlier.

Similarly, Plaintiff submitted her April, 2008, complaint internally about conduct that occurred nearly a decade earlier, and she did so only after Rinaldo had instituted an investigation into her conduct and while the investigation was still pending. Plaintiff acknowledged that she had a contentious relationship with Rinaldo, and after Plaintiff submitted the complaint, she took the complaint no further.

As to Plaintiff's complaints made in 1998 concerning Rinaldo's behavior during her

training, Plaintiff testified that she told Officer Morton, her first training officer, about her training with Rinaldo only after Officer Morton asked her how the training was going. (See Defs.' Mot. Summ. J. (#49), Ex. 1 at 82:11-14.) Likewise, Plaintiff spoke with the training coordinator about Rinaldo's conduct only after the coordinator directed Plaintiff to speak with him about it. Plaintiff testified that she would not have told Officer Morton about her experiences with Rinaldo if she had known that he was going to report them. (*Id.* at 83:20-23.)   Under these circumstances, it appears that Plaintiff's complaint took the form of a personnel dispute rather than the airing of an issue of political, social, or other concern to the community.

Viewed in light of the content, form, and context of Plaintiff's statements, the court finds that Plaintiff has failed to meet her burden of demonstrating that her statements addressed matters of public concern.  Instead, the statements involve the type of individual "personnel disputes and grievances . . . that would be of no relevance to the public's evaluation of the performance of governmental agencies." *Coszalter*, 320 F.3d at 973.  Although the content of Plaintiff's speech addressed, in part, allegations of discriminatory behavior and the functioning of the police department, "speech not otherwise of public concern does not attain that status because its subject matter could, *in different circumstances*, have been the topic of a communication to the public that might be of general interest." *Id.* (*quoting Connick*, 461 U.S. at 148 n.8).  The Ninth Circuit has stated,

> In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern

*Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995).  This is such a case.

Accordingly, the court finds that Plaintiff's statements do not constitute protected speech, and the

1 court will grant summary judgment on Plaintiff's First Amendment retaliation claim.[3]

**B.      Equal Protection**

Plaintiff next alleges that she was denied equal protection because she was discriminated against on the basis of her gender and sexual orientation.[4]  Plaintiff appears to assert both a disparate treatment discrimination claim and hostile work environment discrimination claim.

"'[T]here is a very close relationship between Title VII and equal protection claims,' and, not surprisingly, case law on equal protection tracks case law on Title VII." *Bator v. Hawaii*, 39 F.3d 1021, 1028 n.7 (9th Cir. 1994) (citation omitted).  Thus, although Plaintiff bases her discrimination claims on equal protection, the court nonetheless looks to Title VII cases for guidance.

**1.      Hostile Work Environment**

To survive summary judgment on a claim based on a hostile work environment, "a plaintiff must show that: (1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Porter v. Cal. Dep't Corr.*, 419 F.3d 885, 892 (9th Cir. 2005) (*citing Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2004)).  "Harassing conduct need not be motivated by sexual desire to support an

---

[3]To the extent Plaintiff continues to assert a First Amendment claim based on an unconstitutional prior restraint of speech arising out of the performance directive prohibiting her from talking to or about Rinaldo, the court rejects such a claim.  As discussed above, Plaintiff's statements regarding Officer Rinaldo do not constitute speech protected by the First Amendment.

[4]In the complaint, Plaintiff also alleges that Defendants retaliated against her for reporting Rinaldo's discriminatory and harassing treatment.  To the extent this claim is based on the First Amendment, the court has addressed it above.  To the extent Plaintiff bases this claim on equal protection, Plaintiff does not address it in her opposition.  Regardless, Plaintiff has failed to cite to evidence suggesting that there is a causal connection between Plaintiff's reporting the discrimination and any adverse employment action.  *See Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004) *(citing Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)) (explaining elements of retaliation claim).

inference of discrimination." *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (citation omitted). Instead, a "general hostility to the presence of women in the workplace" is sufficient. *Id.* (citation omitted).

Defendants primarily challenge Plaintiff's ability to demonstrate the third element of a hostile work environment claim. To determine whether conduct was sufficiently severe or pervasive to create a hostile work environment, the court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (citation and internal quotation marks omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* at 271 (citation omitted). The ultimate question is whether a reasonable woman would consider the conduct sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991).

Even assuming, without deciding, that the court can consider Rinaldo's actions in 1998 in assessing Plaintiff's hostile work environment claim, the court finds that the conduct does not rise to the level of severity or pervasiveness required to support such a claim. The events cited by Plaintiff, while offensive, are not threatening and appear to be isolated and offhand incidents. In sum, the instances Plaintiff identifies are not the type of conduct that the Ninth Circuit has found to be so severe and pervasive as to alter the conditions of employment. *See, e.g., Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008) (finding female employee demonstrated material issues of fact concerning the severity of supervisors' conduct where, over the course of nearly one year, supervisors stated, "[w]e don't mind if females are working as long as they don't complain,"

indicated certain food brought to work was only for the guys, referred to their wife as "astrobitch," told plaintiff a foreman needed a girlfriend, told plaintiff not to go into a trailer even though male employees were permitted to enter, and stated, "this is a man's working world out here, you know"); *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047 (9th Cir. 2007) (finding female employee had stated prima facie case for hostile work environment where her supervisor made repeated comments over several months about her legs, followed her into a female restroom and kissed her, and, on at least four other instances, made inappropriate comments, including comments about having sexual relations with her); *Ellison*, 924 F.2d 872 (finding female employee stated claim for hostile work environment where co-worker sent her two letters stating that he had been "watching" and "experiencing" her, making repeated references to sex, and indicating he would write again). Summary judgment with regard to this claim is therefore appropriate.

## 2.    Discrimination

As noted, Plaintiff alleges Defendants discriminated against her on the basis of her gender and sexual orientation. To prevail on a discrimination claim, the plaintiff must establish a prima facie case of discrimination by presenting evidence that "gives rise to an inference of unlawful discrimination." *Cordova v. State Farm Ins. Co.*, 124 F.3d 1145, 1148 (9th Cir. 1997); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff can establish a prima facie case of discrimination through either the burden shifting framework set forth in *McDonnell Douglas* or with direct or circumstantial evidence of discriminatory intent. *See Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) ("When responding to a summary judgment motion . . . [the plaintiff] may proceed using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer].") (citation omitted) (alterations in original).

Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of

establishing a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of disparate treatment discrimination, Plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorable. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (*citing Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000)). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. *McDonnell Douglas*, 411 U.S. at 802. If the defendant provides such a justification, the burden shifts back to the plaintiff to show that the defendant's justification is a mere pretext for discrimination. *Id.* at 804.

Defendants do not dispute that Plaintiff belongs to a protected class and that she was qualified for her position. Instead, Defendants contend that Plaintiff did not suffer an adverse employment action. "For purposes of a disparate treatment claim, an adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis*, 520 F.3d at 1089. "[H]iring, firing, failing to promote, reassignment with significantly differently responsibilities, or a decision causing a significant change in benefits" are adverse employment actions. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted).

Plaintiff contends that Rinaldo's filing of a complaint with Internal Affairs and the subsequent investigation constitute adverse employment actions.[5] However, the majority of the

---

[5] Plaintiff notes that the exclusion from opportunities for salary increases, the denial of support staff, and the denial of promotions are adverse employment actions. However, Plaintiff has failed to cite evidence indicating that she (1) suffered these types of actions or (2) suffered these actions because of her gender or sexual orientation. Plaintiff also notes that a hostile work environment can qualify as an adverse employment action. As discussed above, no reasonable jury could conclude based on the facts before the court that Plaintiff was subject to a hostile work environment. To the extent Plaintiff believes she has identified additional adverse

14

cases Plaintiff cites in support of this contention do not involve adverse employment actions in the discrimination context. *See Coszalter v. City of Salem*, 420 F.3d 968, 974-77 (9th Cir. 2003) (discussing contours of adverse employment actions in context of First Amendment, Title VII, False Claims Act, and Major Fraud Act *retaliation* cases); *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir. 1996) (discussing adverse employment actions in context of *retaliation* claim brought under California's Fair Employment and Housing Act and citing cases involving Title VII *retaliation* claims).

While a prima facie case of Title VII's substantive provision (anti-discrimination) and a prima facie case of retaliation both require an adverse employment action, the two terms are not coterminous. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). Instead, "the scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* Thus, in *White*, the Court rejected standards applied by the Courts of Appeals that "treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision . . . ." *Id.*

As noted above, "[f]or purposes of a disparate treatment claim, an adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis*, 520 F.3d at 1089 (citations omitted). After Rinaldo filed his complaint, an investigation was conducted, and Rinaldo's complaints were found to be unsubstantiated. Although Plaintiff was counseled not to speak disparagingly of her fellow officers, the directive prohibiting her from speaking to Rinaldo was lifted. No disciplinary action was ever taken against Plaintiff, and Plaintiff has not cited evidence suggesting that Rinaldo's complaint and the

---

employment actions, including being given the directive not to speak disparagingly about Rinaldo, not being permitted to work at the air races, and having Rinaldo stand near her desk, the court finds that these actions did not materially affect her employment and are therefore not actionable.

subsequent investigation otherwise materially affected the terms, conditions, or privileges of her employment with RPD.[6] As such, summary judgment with regard to Plaintiff's discrimination claim is appropriate.

### C. Municipal Liability

A municipality may be liable under 42 U.S.C. § 1983 only if a municipal policy or custom was the "moving force" behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). Here, Plaintiff has failed to provide evidence suggesting that the City of Reno has implemented a policy or custom of retaliating against its employees for exercising their First Amendment rights or for discriminating against their employees on the basis of their gender or sexual orientation. Moreover, the court has concluded that no reasonable jury could find that Plaintiff's First or Fourteenth Amendment rights have been violated here. Accordingly, to the extent Plaintiff alleges constitutional violations by the City of Reno, the City is entitled to summary judgment

///
///
///
///
///
///
///

---

[6] The court also notes that it appears highly doubtful that Rinaldo filed the complaint because of Plaintiff's gender or sexual orientation. Rinaldo testified that the only reason he filed the complaint was to get Plaintiff to stop speaking poorly of him to other officers. Beyond Rinaldo's statements made nearly ten years earlier, there is no evidence indicating that Rinaldo possessed a discriminatory animus or otherwise suggesting that Rinaldo filed the complaint because of Plaintiff's gender or sexual orientation.

**D.     Negligence**

Finally, Plaintiff alleges that the City of Reno negligently trained its employees. Plaintiff has not cited to evidence suggesting that the City failed to exercise reasonable care in training its employees. Summary judgment on this claim is therefore appropriate.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (#49) is GRANTED.

IT IS SO ORDERED.

The Clerk of the Court shall enter judgment accordingly.

DATED this 5th day of February, 2010.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE